Good morning, your honors. I'm Jeffrey Baird, representing Mr. Hanbey. This is another flare-up case. We have a client with hepatitis C diagnosed very early with liver biopsies and with repeated examination visits with physicians and repeated treatment visits at the Veterans Administration. The critical standard to consider here was set by the vocational expert and it is this, if he's absent two days a month, he's not employable in the low-skilled jobs he would be available for. So is he going to be absent two days a month? That's the question. Mr. Hanbey testified he had three to four bad days a month. Bad days, he's bedridden, he stays in bed, watches TV, he sleeps a lot, he has aches and pains. They're unpredictable and it's about three or four days a month. That's supported with various findings throughout the VA records, including a lot of laboratory findings and one very dramatic day with Dr. Sasaki, the treating physician. Well, let's talk about that because, frankly, I'm troubled by the fact that there was a concern regarding inconsistencies between Dr. Sasaki's opinion letter and her treating notes. You asked, or somebody asked the ALJ to keep the record open in order to address that issue and there was nothing provided after 60 days in order to supplement the record. I believe it was left open for 30 days and the hearing attorney brought in evidence from Dr. Arnault. But the ALJ said that he waited 60 days for Mr. Hanbey to submit something. Right, but it wasn't a questionnaire from the treating physician, was it? He said it was additional evidence. I thought he said, I'm going to leave the record open so that the claimant can supply additional information, but the claimant didn't supply any to address that issue. So if that's the case, why can't the ALJ then enter his credibility finding and say, based on the inconsistencies between the opinion letter and the treating physician's treating notes and the claimant's inability to supply any clarifying information, I'm ruling against him? Well, I guess the question on this duty to develop question, and it is a duty to develop, which applies whether the claimant's represented or not, and it's an easy duty. It's a duty to ask a question, such as to make a phone call to the claimant's attorney, where is it? Or send an email, where is it? Does the court have to do more than leave the record open? I mean, it seems to me the onus is now on the attorney to take advantage of the leave that the court has given to supplement the evidence. And if he doesn't do it, then hasn't the EIJ or the ALJ discharged his duty? Here the ALJ wasn't that specific, though. Here's what would have been needed, a set of functional limitations and then a justification for each. And in particular, how many days is he going to be absent during a month? Why do you think that? But also, she made findings that were consistent with her statement. It's just it was overbroad. She said 100% disabled, that's overbroad. Let me come at it one more time. Yeah. Because I'm not sure you're answering my question. Was there additional information that would have helped the ALJ resolve the concern? And why wasn't it submitted? What would have helped would have been what they call a medical source statement from Dr. Sasaki, the treating physician, in particular answering the questions, how many days a month is he likely to be absent due to down days? And can he sustain concentration and focus throughout an eight-hour day in two-hour increments? Those are really the questions that go to doing the low-skilled work or unskilled work that VE identified. But the ALJ wasn't that precise in his question. He said, I'm leaving the record open to provide more information, but didn't ask for that. And that would have been an easy thing to ask for, and it would have really clarified with. So is your argument that the claimant, he was represented by counsel at that point or no? He was represented by an attorney. So is it your argument that the attorney didn't understand what it was that he was to supplement, and so he chose to do nothing? No, he did something. He brought in Dr. Arno's reports from earlier on, didn't he? And that was another doctor who said 100% disabled and made neurological findings. Maybe I misread the ALJ's decision, but I thought he said, I left the record open and after 60 days when I hadn't received anything, then I closed it. Maybe I misread. No, I think he did, but the specific question wasn't, get me a set of limitations from the doctor, from Dr. Sasaki. That would have helped. No, this is a different question. My question is, what, if anything, was submitted during that 30-day or 60-day period? Anything? It looked like it was the reports from Dr. Arno and the earlier liver biopsy stuff. Okay. In any event, Dr. Sasaki had plenty of supportive findings in her clinical records. On page 293, she finds him extremely fatigued. She records him as looking much older, and she gives him hydrocodone for his pain, again diagnoses a chronic hepatitis C. It appears to be one of his down days. There are other days that he's not as impaired or he's having more up days. So the question really is, is he going to be absent two days a month with flare-ups? The record also includes his very honest discussion of daily activities, and he does have periodic things he does that reveal better functioning. Three times a year, he golfs with a golf cart. Once a year, he goes skiing. He has meetings once a month for an hour, and sometimes he can't make those. Usually, he said two times a year he can't make that volunteer meeting. None of these activities contradict flare-ups that would be consistent with being absent two days a month or concentration deficits that would affect two-hour increments. I'm sorry, counsel. I don't mean to interrupt you, but I found the reference. It's actually on the first page of the ALJ's ruling. He says, at the close of the hearing, the representative requested that the record remain open for the submission of an additional assessment by the treating specialist, Dr. Sasaki. A 30-day extension was granted for the submission of additional medical evidence, but after 60 days, no additional information of any nature has been submitted. Is that true? He caught me flat-footed on that. I have to assume it is true because that's what it said. That's what the ALJ said. That seems to undermine the argument that the lawyer didn't know what it was that the ALJ was waiting for.  What's vague? I'm leaving the record open for a submission of an additional assessment by the treating specialist, Dr. Sasaki. Well, true. I guess my argument here is there's two days a month absence. That's the question. And that wasn't answered. That's true. The plaintiff's attorney, after the hearing, could have obtained that from Dr. Sasaki. I'm not sure why he didn't or why he wouldn't have written it up afterwards. But he didn't supply it. Well, then that's a different question then. If that's the crucial person to answer the question, and if he said he would get it and didn't, what burden does the ALJ have in duty to develop? An extra phone call? An email? Anything like that, rather than, with quiet speed, let the time go on. But why can't we do this all the time in all kinds of proceedings? We leave the record open. And if nothing more is submitted, we generally conclude that there's nothing more to say on the subject. Well, I would still argue that there were findings within the VA reports that supported down days, repeated episodic fatigue. But as I understood the ALJ's concern with the down days, it was basically relying totally on self-reporting by your client. And the lay testimony from the client. And he missed a lot of VA medical appointments to do evaluations to help. And the ALJ said, well, I'm not going to give a lot of weight to the VA disability rating because it relies almost entirely on self-reporting. And he's got this history of not coming in to make his evaluation appointments. I concede that history. However, that doesn't answer, does he have down days, and will he miss two days a month? That use of, it's a bit too general. It doesn't get to the down days. It doesn't get to likely absences. And that's what's hard to say here. We know that Dr. Gosnell, Dr. Arno, and Dr. Sasaki all found episodic fatigue. And again, on page 293 of the record, Dr. Sasaki had an extreme fatigue day that she found and noted that this was consistent with the chronic hepatitis C. And there are the repeated lab findings showing the abnormal liver enzymes that are quite high or abnormal. But it's true, the record would have been helped greatly with a statement. Can he last an eight-hour day? Can he last a 40-hour week? How many absences per month? Do you want to save some time? I'll just save time. Okay. Maybe let's hear from the government. Good morning. Jordan Goddard, appearing for the Commissioner. Let me ask you just a question that's been bothering me from the outset of this case. What's the difference between the standard that the VA applies for disability findings versus the standard we're applying here? Well, that's an interesting question because the case law describes them as markedly similar. And to be perfectly honest, I have had a lot of difficulty actually finding any similarity between the two programs, other than that they're both intended to assess disability. The VA disability system uses this percentage system of rating disability, whereas the Social Security Act requires us to do an either or, either you're disabled or you're not. There is no percentage rating. And it is a classic dilemma for our administrative law judges to interpret these 60% ratings or 30% disability ratings from the VA and to apply them in our cases because there is actually a significant amount of difference between these two rating systems. Like I said, there's no percentage disability. You're either able to perform substantial gainful activity or you're not. And the fact here is that Mr. Hanby was found to be 60% disabled. Under the VA's guideline, that translates to 100% unemployability. What that means, I honestly don't know. We don't have a disability unemployability system. You're either employable, meaning you're not disabled, or you're not. So as far as reconciling the two systems, it's a very difficult dilemma that the administrative law judges face. And they try to put forth a good faith effort to consider the VA disability rating and to not just look at that percentage but to look at the reasons why, the actual limitations that the VA is finding that the person has and the reasons that they found those limitations to exist. So VA's finding of 100% unemployability based solely on the 60% figure? Or I couldn't quite tell. Yes, yes. In this case, the 60% disability translates to 100% unemployability. Automatically, regardless of? Yes, yes. I believe it's defined in their regulatory scheme. They have basically a chart that you look at, and different percentages of disability based on different types of impairments can lead to a different level of unemployability. Okay. And so why didn't the ALJ here err in not giving more weight, I guess, to the VA's determination? Well, the ALJ looked at the underlying reasons that the VA used in coming to that determination. And most notably, Mr. Hanby had alleged an uncontrollable weight loss due to hepatitis infection, which is a significant objective finding. And, in fact, under the VA disability guidelines, that uncontrollable weight loss entitles him to a minimum of 60% disability. That's specifically in the guidelines and is what is cited in the VA disability determination report. However, that claim of significant weight loss wasn't actually based on examination. As Judge Tallman pointed out, Mr. Hanby has a serious history of missing examination appointments. Notably, they always seem to be when he's going for an examination for disability purposes. He doesn't show up. So they actually said in the report that we did not have important objective evidence that could have been obtained from these examinations, and we just had to go ahead and make our determination. And so they accepted his report at face value and found him to be 60% disabled. Well, when the ALJ looked at the record that was before him in the Social Security context, there were some notable discrepancies. In 2004, for instance, he has a consultative examination with Dr. Gosnell, a psychologist. And he reports in 2004 that, for the last 12 years I've put on 20 pounds because I'm so depressed I can't keep the weight off. So when he's trying to establish a disability based on depression, he can't keep the weight off. When he's trying to establish disability based on hepatitis infection, he can't keep the weight on and he's wasting away. And as the ALJ noted, this wasting away claim is just not consistent with the treatment records. In fact, his regular annual physical exam in 2005, afterwards the nurse practitioner mailed him information on obesity, weight loss, and nutrition to help him get his weight down a bit. So the entire premise of this VA disability rating turned out to be completely false. They thought that there was objective medical evidence of significant progression in this hepatitis infection that turned out to just simply not exist according to the record that was in front of the administrative law judge. And in fact, Mr. Handy made claims that directly contradicted the claims he made to the VA. And so here I believe that the administrative law judge is finding that that VA disability rating really is not reliable, is supported by substantial evidence. In addition to the contradiction between the issue of weight, Mr. Handy also engaged in a very robust number of daily activities of living. If you look at Dr. Gosnell's report, which I think is very informative, it was done only a month after Mr. Handy's date last insured, which is when his coverage for disability benefits expired. Dr. Gosnell notes some very, very interesting activities of daily living. Like he says, his wife has a nonprofit business, which he does the bookkeeping for, in addition to running his own nonprofit business, the Superfund cleanup site. He does the majority of the household chores. For exercise and recreation, he plays golf, he goes skiing, takes regular walks. And does the household finances. But what point in time, I don't remember, what point in time was the doctor referring to there? Because I thought things deteriorated quite significantly as you went forward. Well, it's really important here to keep the date last insured in mind, because the date last insured is September 30, 2005. If Mr. Handy's condition deteriorated after that, it's unfortunate, but he doesn't have insurance coverage after that. So he has to establish that he was disabled by September 30, 2005, or he does not qualify. And the report by Dr. – that's why Dr. Gosnell's report is so significant. He did his examination in October, exactly one month – or, excuse me, October 2004. Excuse me, 11 months before the date last insured expired, not one month after. I apologize for that misstatement. But this is right in the heart of the time that he has to establish disability. And these are his current activities of daily living. We don't see any kind of significant deterioration until possibly Dr. Crossen's report in 2007, which is a full two years after that. And we can tell that there's a deterioration because at that point, Dr. Crossen is saying he's got depression. He's diagnosing depression at that point. If you look at Dr. Gosnell's report in 2004, though, he clearly says that Mr. Handy is non-depressed, is the term that he uses. On his list of diagnoses, the only diagnosis is a rule-out cognitive disorder for which he recommends further cognitive testing, which ultimately is done and doesn't show cognitive deficit. But Dr. Gosnell is pretty clear that Mr. Handy does not have clinical depression at this point. And there is no evidence that as of his date last insured, September 2005, that his clinical depression or any depression or anxiety he had was more significant than what was assessed by the administrative law judge. And the administrative law judge actually did err on the side of giving Mr. Handy the doubt here and limited him to semi-skilled and unskilled work, where historically he's always done skilled work. He's a college-educated individual who's done management jobs. He's worked at the skilled levels his whole life. So the administrative law judge gave him the benefit of the doubt and said you can't do that skilled work that you've been doing your whole life, but there's nothing here that says you're not capable of doing a lower-level job. And when we look at these activities of daily living, you seem to have some robust ones. In fact, in 2007, which is right around the time that Dr. Crossen seems to be indicating some possible deterioration, there are some interesting emergency room records where Mr. Handy goes into the emergency room because he put a nail through his thumb while using a nail gun, which scares the heck out of me to use, and then two months later comes in again with an eye injury because he was cutting for mica and wood and got a sliver in his eye while he was working in his woodshop. So to the degree that Mr. Canby is claiming that he has debilitating symptoms, he simply has not carried his burden of showing that, in fact, these symptoms, if they were present at all, were present back in 2005 when he needed to establish disability. I'd like you to respond, if you would, to your colleague's argument that what needed to be shown was simply an absence two days a month to show non-employability. Do you concur with that? Yes. If that is a credible statement, then according to the vocational expert, Mr. Handy is disabled. But it is not a credible statement. And in this case, the administrative law judge did an excellent job of explaining why Mr. Handy wasn't credible. You start with the issue of his misrepresentations to the VA regarding his weight. This is a misrepresentation that's made in the context of a disability benefit claim, a significant one. Then you go to the activities of daily living. He's got very robust activities of daily living that aren't consistent with his claims of debility at all. I think it's important to note that he's made more claims than just claiming that he has two bad days a month. He claimed much more significant limitations. And when all of those subjective limitations have to be considered in totem to some degree, because if we're just going to isolate this, I have two bad days a month, no one can ever disprove that claim. You have to look to a slightly broader credibility determination. And when you add in things like the fact that he's missing all these examinations, every time the VA tries to schedule an examination for disability evaluation purposes, whether it's back in 2002 or up in 2005 after Dr. Gosnell says he needs further examination and he stops answering phone calls from the VA for about two years before we turn him down and he decides he needs to go in and get an evaluation from Dr. Croson, he has this long history of simply not showing up for appointments when it's time to do the evaluations. And the case law is clear that that speaks against the credibility of the witness or the claimant in this case. And so in totem, Mr. Hanvey simply isn't a credible individual. His entire case turns on subjective allegations that cannot be verified. And the administrative law judge's determination is supported by substantial evidence in the record as a whole that his claims just are not credible. He's engaged in a robust number of daily activities, and he hasn't been cooperative. Dr. Croson additionally noted that there's some poor effort, he thought, during the evaluation. He had to, during a psychomotor testing test, he had to, as Dr. Croson put it, gently remind Mr. Hanvey that you're allowed to use two hands for that test. And when he did so, he, in Dr. Croson's words, markedly improved his abilities. I thought there were some tests, though, where it was clear that it would be almost impossible to fake essentially the level of your inability to perform. Isn't that the case as well with some of the other tests? Well, interestingly, the other tests, Mr. Hanvey points out that he had below average scores on these tests. Below average is not impaired, is not unable to do. If we're going to interpret below average as meaning unable to perform, then by definition half of the population has just become disabled because half of us are below average in terms of manual dexterity and things like that. The only area where Dr. Croson found a real inability to perform was in rapid clerical tasks. And to the degree that's not been accounted for in the administrative law judge's decision, it's completely harmless because none of the representative occupations he found are clerical in nature. So with the elimination of the clerical issue, all we really have is this psychomotor thing where there's some question about the effort he put forward and then some below average findings which don't equate to an inability to do something when it comes to disability. You need more than that. I don't think we have any further questions for you. Then I thank you and urge you to affirm the commissioner's decision. Thank you, counsel. Mr. Barrett, I think you have some time in rebuttal. Just a little bit, Your Honor. Thank you. Go right ahead. Dr. Croson made specific findings of depression, anxiety. He noted stressors in the life, and he found significant impairment in attention and concentration, notably for routine type of tasks. The psychomotor slowing is one of the tests that would be very hard to fake because a psychologist would be able to see how are they processing information in motion. So that would be very determinative for the diagnosis, I would think, but also showing that there's impairment in the ability to concentrate and attend. And remind me, if you would, when was Dr. Croson's report? Dr. Croson's is after the date last insured. He did it in October 2007, I think, September 2007. But the identification of problems with attention and concentration goes all the way back to Dr. Arno in 2002. He's the neurology professor at USC, and he noted there were problems in digit span retention or paying attention and concentrating. He thought it was a cognitive impairment. He didn't say necessarily it was driven by depression, but he did find the same thing that Dr. Croson found later, the inability to attend and concentrate, to stay on task. That was also his own testimony and his wife's testimony. He has trouble staying on task. The distinction with Dr. Croson isn't that it's worse. It's that there's a new explanation. He does all the neuropsychological testing and then comes up with what he called a differential diagnosis. He's kind of experimenting. There's some underlying entity going on, but what's driving it? Is it depression? Is it anxiety? It's rooted in the emotions, so that he recommended counseling treatments that might help resolve or help mitigate this problem. He does identify real deficiencies in attention and concentration, which again might well affect two-hour increments of work throughout an eight-hour day, 40-hour weeks, two absences a month. Regarding the VA rating, it was interesting. Dr. Sasaki never took it back. It was there, the 60% leading to 100% TDIU, total disability, never took it back. She had Dr. Croson's evidence. She had a lot of her own clinical findings and never took it back. It may be that the alleged weight loss, although there was a variation of roughly 20 pounds, from 185 to 205, it may be that wasn't what was driving the assessment. It was that there's the presence of the hepatitis C, it's hard to treat, and the treatments are not effective in eliminating all the flare-ups. As far as the robust activities of daily living, they're hardly robust. They're self-scheduled. They are all tolerant of the periodic, episodic absences or inabilities, flare-ups, down days, two absences a month. The one measurable one, I suppose, would be the scheduled meetings. That's once a month. He said he missed two a year. That would be consistent with his pattern of one to four days a month of down days. And that is it. I surrender it to you. Thank you. Okay. Thank you both very much. The case just argued is submitted.
judges: Gleason, Tallman, Watford